IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AKEEM MONROE,**<br><br>           Plaintiff,<br>   v.<br><br>**CITY OF PHILADELPHIA, DEPARTMENT OF STREETS,**<br><br>           Defendant. | **CIVIL ACTION**<br><br>**NO. 24-1358-KSM** |

## MEMORANDUM

**MARSTON, J.**                                                                                                     **March 20, 2025**

Some jobs require intense, physical labor.  And if a person cannot do such work due to a disability, an employer need not hire them.  Plaintiff Akeem Monroe received a conditional offer to work as a laborer, specifically a trash collector, for Defendant the City of Philadelphia, Department of Streets (the "Department").  As part of his offer, Monroe had to pass several pre-employment tests, including a physical examination.  Unfortunately, during his physical, the doctor discovered that Monroe had a hernia and would require surgery before he could be reconsidered for employment.  More than eight months later, Monroe had surgery and notified the Department that he would be able to work once he recovered.  At that time, he learned that his conditional offer had been rescinded.  Because Monroe was not qualified for the job then and did not request a reasonable accommodation under the Americans with Disabilities Act ("ADA"), the Court grants summary judgment for the Department and dismisses with prejudice Monroe's claims for disability discrimination, failure to accommodate, and retaliation.

I.      **Background**

On January 2, 2020, Monroe applied to become a trash collector with the Department and indicated that he was open to a temporary position. (Doc. No. 23-2 at 7; Doc. No. 16-11 at 6.) Monroe was selected for a temporary position and had to undergo several medical tests to see if he could handle the physical demands of the job. (Doc. No. 23-2 at 8.) He passed these tests and started to work for the Department as a trash collector around October 19, 2020. (Doc. No. 16-5 at 15; Doc. No. 16-13 at 2.) Per Department policy, a temporary assignment—like the one Monroe received—should not exceed six months.[1] (Doc. No. 16-2 at 2.)

As a trash collector, Monroe rode on the back of a trash truck and picked up residential and commercial trash. (Doc. No. 23-2 at 8.) He described this job as physically demanding, saying he would pick up multiple trash bags at once, which could weigh up to fifty pounds. (*Id.* at 9.) At times, he would have to lift even heavier items, such as refrigerators, beds, TVs, and couches. (*Id.*) But shortly after he started, in December 2020, Monroe hurt his back while lifting a recycling can. (*Id.* at 10.) After taking a day or two to recover, he returned to work on a special "light duty" assignment—guarding the Department's "yard" at night. (*Id.* at 11.)

Monroe returned to full duty in January 2021. (*Id.*) That spring, he had two more work-related injuries that required him to take time off: (1) In April, his finger was pricked by a needle when he picked up a trash bag, and (2) in May, urine from a trash bag splashed in his eye. (*Id.* at 11–12.) After both accidents, the Department let Monroe take time off to receive medical treatment. (*Id.*)

Monroe's temporary assignment with the Department was set to end on June 8, 2021.

---

[1] Both parties agree that Monroe's employment lasted beyond the six-month assignment. (*See* Doc. No. 23-2 at 15.) Nevertheless, the parties also agree that he received a temporary assignment from the Department and that his temporary assignment ended on June 8, 2021. (Doc. No. 16-5 at 19, 55.)

(*Id.* at 8.)  Four days before then, the Department extended Monroe a conditional offer of permanent employment as a trash collector.  (*Id.* at 13.)  The offer was conditioned upon Monroe's ability to "pass all pre-employment tests," including a "medical examination."  (Doc. No. 16-10 at 2.)

His medical examination was scheduled for June 9, 2021.  (*Id.*)  The day before his examination, however, Monroe suffered another back injury while lifting a trash can.  (Doc. No. 23-2 at 15–16.)  Despite this injury, he still attended his physical examination the next day.  (*Id.* at 16.)  There, he was diagnosed for the first time with a hernia and was told that he did not pass his physical.[2]  (*Id.*)  To get medically cleared for the job, the physician who conducted the examination indicated that Monroe required surgery to address his hernia.  (Doc. No. 16-5 at 32; Doc. No. 16-25 at 3.)  Because he had not passed the physical, the doctor marked that Monroe was placed on "medical hold" and would be reconsidered for employment once his hernia was fixed.  (Doc. No. 16-4 at 2; Doc. No. 16-25 at 3.)  Ultimately, however, Monroe would not work for the Department after June 8, 2021.  (Doc. No. 23-2 at 2.)

After he had not passed his physical, Monroe sought workers' compensation benefits from the City of Philadelphia.  Monroe claimed that the hernia was a result of a work-related injury in December 2020.  (Doc. No. 16-31 at 2.)  The City initially contested his claim (*see* Doc. No. 16-31), but the parties eventually agreed to a stipulation that Monroe had suffered a hernia due to a work-related injury, which resulted in his "total disability" as of June 10, 2021 (*see* Doc. No. 23-7 at 6–9).  The workers' compensation court adopted the parties' stipulation on January

---

[2] In his deposition, Monroe testified that he first learned that he had a hernia during his physical on June 9, 2021.  (*See* Doc. No. 16-5 at 32.)  Yet in his related workers' compensation case, Monroe claimed that he told doctors he had a hernia after his accident in December 2020, but the doctors supposedly told him that he did not have a hernia.  (*Id.* at 38.)  No medical records substantiate Monroe's claim that he told doctors that he had suffered a hernia before his June 2021 diagnosis.

3

12, 2021, and ordered the City to "pay compensation, medical expenses, litigation costs and counsel fees in accordance with the . . . [s]tipulation." (Doc. No. 23-7 at 5.) Monroe received workers' compensation benefits from June 10, 2021, through November 2022.[3] (Doc. No. 23-2 at 17–18; Doc. No. 16-5 at 43.)

While the parties litigated his workers' compensation claim, Human Resources ("HR") for the Department emailed Monroe on August 3, 2021, to let him know that he needed to take an additional step—surgery to address his hernia—to get medically cleared for the permanent role. (Doc. No. 16-10 at 2.) This email also asked Monroe to "provide an update on when [he] expect[ed] to complete this additional step," i.e., to have the surgery. (*Id.*) He responded that he was waiting on a surgery date from his doctor and expected to have that information within the week. (*Id.*) But there is no evidence that Monroe followed up with HR until March 2022—when he got his surgery. (Doc. No. 16-5 at 43.)

After he underwent surgery to correct his hernia, Monroe learned that the Department no longer had an open position for him.[4] (Doc. No. 23-5 at 2–3.) Based on this information, he did not reapply for a position with the Department or retake the physical. (*Id.* at 20.) Monroe was

---

[3] At oral argument, the Court asked Monroe's counsel when Monroe stopped receiving workers' compensation benefits. Counsel responded that it was around June 2023, but he mentioned that he had the exact date in his files. (*See* Mar. 11, 2025 Hr'g Tr. at 35:18–36:8.) The Court followed up with the parties to get this exact date via email, and defense counsel responded that Monroe stopped receiving workers' compensation benefits on November 2, 2022. The Court held a status conference on March 18, 2025, to confirm both that this date was accurate and that the Court could consider this information. At the status conference, Plaintiff's counsel agreed that Monroe stopped receiving workers' compensation benefits on November 2, 2022, and confirmed that the Court could consider this fact for purposes of this motion.

[4] In an affidavit submitted to the Pennsylvania Human Rights Commission, Monroe swore that he called "Robert Drumwright" *after* his surgery and was told that "the position was filled." (Doc. No. 23-5 at 3.) During his deposition, however, he testified that *before* he got the surgery, he made calls to the Department and was told that he "would have to reapply again and get [picked] because it's not guaranteed." (Doc. No. 16-5 at 43, 47.) Viewing the facts in the light most favorable to Monroe as the non-moving party, the Court will assume that he learned that there were no spots available with the Department after his surgery.

4

later cleared to return to full duty on June 17, 2022.  (Doc. No. 23-2 at 19; Doc. No. 16-5 at 43.)

Monroe filed his charge of discrimination against the Department for disability discrimination and retaliation on June 24, 2022.  (Doc. No. 23-2 at 2; Doc. No. 16-6 at 2–3.)  The Pennsylvania Human Relations Commission found no probable cause for his charge because his "temporary job assignment ended on June 8, 2021."  (Doc. No. 16-33 at 3.)  It reasoned that Monroe was given a conditional offer of employment from the Department but that he "failed the required physical exam."  (*Id.*)  Thus, the Commission found insufficient evidence that the Department had discriminated against him based on his disability.  (*Id.*)

The Equal Employment Opportunity Commission ("EEOC") issued Monroe a right to sue letter on January 2, 2024.  (Doc. No. 1 at 3.)  He sued the Department on April 1, 2024 (*id.*) and filed an Amended Complaint on April 10, 2024 (Doc. No. 3).  In his Amended Complaint, he brings claims against the Department for disability discrimination, failure to accommodate, and retaliation under the ADA and Pennsylvania Human Relations Act ("PHRA").  (Doc. No. 3 at 5–9.)  The Department now moves for summary judgment on all claims.  (Doc. No. 16.)  Monroe responded on February 4, 2025 (Doc. No. 23), and the Department replied three days later (Doc. No. 24).  The Court held oral argument on March 11, 2025.  (Doc. No. 25.)

## II.     Standard of Review

Summary judgment is appropriate when the "materials in the record," show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable

jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (internal quotations omitted); *see also Matsushita Elec. Indus. Co..*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation,

6

there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (internal quotations omitted). "[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal quotations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

### III.   Discussion

Monroe brings three claims against the Department under the ADA and PHRA: (1) that he was discriminated against because of his disability (hernia); (2) that the Department failed to accommodate his disability; and (3) that the Department retaliated against him because he requested an accommodation for his disability. (Doc. No. 3 at 5–9.) Because the same legal standards apply to the ADA and PHRA, the Court considers Monroe's ADA and PHRA claims together. *See, e.g., Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("[W]e will only discuss [the plaintiff's] ADA claim because our analysis of an ADA claim applies equally to a PHRA claim."); *Boice v. Se. Pa. Transp. Auth.*, Civil Action No. 05-4772, 2007 WL 2916188, at *12 n.20 (E.D. Pa. Oct. 5, 2007).

In the Department's motion for summary judgment, it makes two types of arguments. First, it argues that Monroe's claims are time-barred because he failed to file a charge of discrimination within 300 days of the alleged unlawful employment practice. (Doc. No. 16-2 at 10–15.) Second, it argues that Monroe's claims fail on the merits because he was not qualified

for the permanent position, did not request an accommodation, and was not retaliated against. (*Id.* at 15–26.) Because the Department's second argument persuades, the Court does not address the first.

### A. Disability Discrimination

To prevail on his disability discrimination claim, Monroe "must first make out a prima facie case of disability discrimination." *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 443 (E.D. Pa. 2006). A prima facie case of disability discrimination under the ADA requires him to show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor*, 184 F.3d at 306 (cleaned up). "[T]he determination of whether a plaintiff is qualified for the position in question is made at the time when the challenged employment action actually occurred." *Wiker v. Lancaster Gen. Health*, No. CV 24-2592, 2024 WL 5109419, at *4 (E.D. Pa. Dec. 13, 2024) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)). Pursuant to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), if Monroe makes out a prima facie case of disability discrimination, the burden shifts to the Department to articulate a legitimate, nondiscriminatory reason for terminating his employment. *See, e.g.*, *Cunningham v. Novo Nordisk,* Civil Action No. 12-6654, 2014 WL 1318390, at *4 (E.D. Pa. Apr. 1, 2014); *Barclay*, 435 F. Supp. 3d at 445. If the Department carries its burden, Monroe must show that the Departments' stated reasons were false and merely pretextual. *Cunningham*, 2014 WL 1318390, at *4; *Barclay*, 435 F. Supp. 3d at 445.

To start, the Court finds that Monroe has shown that he was disabled within the meaning

8

of the ADA.  Under the ADA, one definition of "disability" is "a physical . . . impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A).  Here, Monroe's hernia substantially limited his ability to engage in major life activities, such as lifting, walking, and standing.  As Monroe admitted in his deposition, he could not lift anything from the summer of 2021 through most of 2022, and it was painful for him to walk, sit, or stand for extended periods of time.  (Doc. No. 23-2 at 22.)  So, under the ADA, Monroe was disabled due to his hernia.

While Monroe has met the first element of his disability discrimination claim, he cannot meet the second element because he was not qualified to perform the essential functions of a trash collector, with or without a reasonable accommodation.  As Monroe described, this job was physically demanding and would require him to lift heavy items, including refrigerators, beds, TVs, and couches.  (Doc. No. 23-2 at 9.)  The job description described the role along similar lines, stating that the essential functions of the job include "manual work usually of a repetitive nature" and "physical exertion."  (Doc. No. 16-11 at 8.)  Because of the physical demands of this job, the Department required all applicants to take and pass a physical examination to make sure that they can perform such work.  (Doc. No. 16-10 at 2.)

It is undisputed that Monroe could not perform the essential functions of the job, with or without reasonable accommodation, because of his hernia.  (Doc. No. 23-2 at 21–22.)  From his diagnosis of a hernia in June 2021 until after his surgery in March 2022, Monroe testified that he could not lift his small children, grocery bags, or anything heavy.  (*Id.* at 22.)  Nor could he jump

9

or run, and he experienced pain when he walked, sat, or stood for extended periods of time. (*Id.*) Even more to the point, Monroe did not pass his required physical to become a permanent trash collector, and a worker's compensation court declared him "totally disabled" as of June 10, 2021—the day after he failed his physical. (*Id.* at 20–22.) His medical records further show that his hernia got progressively worse after that, and a doctor concluded that he would not be able to return to work until after he had surgery to address his hernia and a suitable recovery period. (Doc. No. 16-26 at 5–6.)

In short, Monroe was not qualified to perform the essential functions of a trash collector due to his hernia. The Court accepts Monroe's statement that he did not learn his conditional offer was rescinded until shortly after his hernia surgery in March 2022.[5] (*See* Doc. No. 23-5 at 2). At that time, however, Monroe was not qualified for the job. He had just started recovering from his surgery, and a doctor opined that Monroe required a few weeks of recovery from surgery before he could return to work. (Doc. No. 16-26 at 5–6.) Monroe himself testified that he did not fully recover until June or July of 2022. (Doc. No. 16-5 at 45.) And he was not cleared to return to full duty work until June 17, 2022. (*Id.* at 43.) In other words, when Monroe learned that his conditional offer had been rescinded, he could not perform the essential functions of the job.[6] *See Wiker*, 2024 WL 5109419, at *4 (explaining that courts must assess

---

[5] At oral argument, Monroe's counsel speculated that his conditional offer may have been rescinded sometime between August 3, 2021, and March 2022. (Mar. 11, 2025 Hr'g Tr. at 24:6–17.) In his brief, however, he argued that "this Court must infer that Defendant had not rescinded the offer of employment until in or around March of 2022." (Doc. No. 23-1 at 9.) Nevertheless, even if the Court were to credit Monroe's position at oral argument, Monroe's disability discrimination would still fail because he could not lift his small children, grocery bags, or anything heavy until *after* his hernia surgery. (Doc. No. 23-2 at 21–22.) So, if the adverse employment action occurred *before* his hernia surgery, he was also unqualified for the job at that time.

[6] Monroe's counsel conceded at oral argument that when he learned that there were no openings in the Department, he could not perform the essential functions of a trash collector. (Mar. 11, 2025, Hr'g Tr. at 26:4–16.)

10

whether a plaintiff is qualified for the job when the adverse employment action occurs).

Plus, Monroe has not shown that he could perform the essential functions of a trash collector with a reasonable accommodation. For one, as discussed below, he never requested an accommodation. For another, even if he had requested one, he has not identified an accommodation that would have allowed him to pick up heavy items. And the Department "was under no obligation to create a light duty position for him where one was not otherwise available." *Krouse v. Am. Sterilizer Co.*, 984 F. Supp. 891, 903 (W.D. Pa. 1996), *aff'd*, 126 F.3d 494 (3d Cir. 1997). Because he was not qualified for the job, with or without reasonable accommodation, Monroe cannot make a prima facie case for disability discrimination under the ADA. The Court thus grants the Department's motion for summary judgment on his disability discrimination claims under the ADA and PHRA.

B.    **Failure to Accommodate**

In his Amended Complaint, Monroe also sues the Department for denying his request for an accommodation. (Doc. No. 3 at 5–7.) The Department moves for summary judgment on this claim because, it says, Monroe never made an accommodation request during his employment. (Doc. No. 16-2 at 25.) Monroe counters that he "requested . . . treatment via the workers' compensation benefits which would constitute an accommodation [that] Defendant denied." (Doc. No. 23-1 at 13.) The Court agrees with the Department that Monroe's request for treatment through the workers' compensation process does not constitute an accommodation request under the ADA.

"A plaintiff bringing an ADA failure-to-accommodate claim must establish: (1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably

accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (internal quotations omitted). Under the ADA, a "reasonable accommodation" includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). The EEOC has further defined "accommodations" as:

> (i) Modifications or adjustments to the job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
>
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).

In interpreting the statute and implementing regulations, courts have rejected similar arguments to the one that Monroe makes here—that a request for treatment is an accommodation request under the ADA. In *Desmond v. Yale-New Haven Hospital, Inc.*, 738 F. Supp. 2d 331 (D. Conn. 2010), for example, the court rejected plaintiff's argument that a request for medical treatment could be a reasonable accommodation request under the ADA. *Id.* at 350–52. It reasoned that "nothing in the text of the ADA or in the regulations promulgated thereunder contemplate that an employer should be required to provide a disabled employee with medical treatment in order to restore her ability to perform essential job functions." *Id.* at 350. Indeed,

because the medical treatment sought by plaintiff did "not propose or reference any change in the work environment or involve the removal of workplace barriers," it was "not a reasonable accommodation" request under the ADA. *Id.* at 351. And the Court worried that an opposite conclusion "would require" employers "to provide for all treatments that a disabled employee deems necessary to restore [his] capacity to perform essential job functions." *Id.*

The Supreme Court of New Jersey reached a similar conclusion when interpreting a state law that mirrored the ADA. In *Caraballo v. City of Jersey City Police Department*, 204 A.3d 254 (N.J. 2019), the court explained that while an employer must "modify the work environment and remove workplace barriers in an attempt to accommodate the physical disability of the employee," an employer need not "acquiesce to the disabled employee's requests for certain benefits or remuneration." *Id.* at 270 (internal quotations omitted). Because the medical surgery that plaintiff sought was "neither a modification to the work environment nor a removal of workplace barriers," the Court determined that the requested surgery did not qualify as a reasonable accommodation. *Id.* at 271.

Both *Desmond* and *Caraballo* are instructive here. Monroe filed a workers' compensation claim against the City of Philadelphia to get the City to pay for, among other things, surgery to address his hernia. (Doc. No. 23-1 at 13.) His claim did not propose a modification to the work environment or the removal of workplace barriers to accommodate his physical disability. Instead, his workers' compensation claim asked the Department to foot the bill for his hernia surgery, so he, in turn, could perform the essential job functions of a trash collector. Thus, Monroe's workers' compensation claim was not a request for accommodation under the ADA, and the Department did not fail to accommodate such a request because none

13

was made.[7] *See Curro v. HD Supply, Inc.*, No. 219CV19198BRMJAD, 2020 WL 3496955, at *8 (D.N.J. June 29, 2020) ("[B]ecause a workers' compensation claim . . . is not a modification of a work environment nor removal of workplace barriers, a workers' compensation claim cannot constitute a request for accommodation.").[8] Accordingly, the Court grants the Department's motion for summary judgment with respect to Monroe's failure-to-accommodate claims.

### C. Retaliation

Monroe last brings retaliation claims under the ADA and PHRA. (Doc. No. 1 at 7–8.) Under the ADA, a prima facie claim of retaliation requires proof that "(1) a plaintiff be engaged in a protected activity, (2) the plaintiff be subjected to an adverse employment action by the [employer], and (3) a causal connection between the protected activity and the adverse employment action exists." *Monaco v. Limestone Veterinary Hosp.*, 152 F. Supp. 3d 253, 263 (D. Del. 2016). "Protected activity under the ADA includes retaliation against an employee for requesting an accommodation." *Dreibelbis v. County of Berks*, 438 F. Supp. 3d 304, 319 (E.D. Pa. 2020) (internal quotations omitted).

Here, Monroe's retaliation claims fail for two reasons. First, Monroe's sole argument as to the first element is that he engaged in a protected activity "when he requested treatment for his hernia as a work-related injury." (Doc. No 23-1 at 16.) In other words, Monroe asserts that he

---

[7] Monroe filed his workers' compensation claim based on an alleged injury from his temporary assignment with the Department. (Doc. No. 16-31 at 2.) But when he filed his claim, his temporary assignment with the Department had ended (Mar. 11, 2025 Hr'g Tr. at 28:9–17), and he had not passed the physical to become a permanent employee of the Department (*id.*). In other words, Monroe was not an employee of the Department when he filed his workers' compensation claim.

[8] The Court notes that Monroe ultimately did receive surgery and total disability benefits through the workers' compensation process. (Doc. No. 23-2 at 17–18.) But "the fact that [Monroe] believes certain treatments were unduly delayed or denied during that process simply does not give rise to a cognizable ADA failure to accommodate claim." *Desmond*, 738 F. Supp. 2d at 352.

engaged in a protected activity when he filed a workers' compensation claim. Yet "[n]early every court that has confronted the issue has held that the filing of a workers' compensation claim in itself is not protected activity under the ADA—in other words, that an ADA-based claim of retaliation for the filing of a workers' compensation claim cannot stand." *Kendall v. Donahoe*, 913 F. Supp. 2d 186, 193 (W.D. Pa. 2012), *aff'd sub nom. Kendall v. Postmaster Gen. of U.S.*, 543 F. App'x 141 (3d Cir. 2013); *see also Lanza v. Postmaster Gen. of U.S.,* 570 F. App'x 236, 241 (3d Cir. 2014) ("Filing a claim for workers' compensation does not constitute protected activity under either the Rehabilitation Act or Title VII."). Nor was his request for treatment through the workers' compensation process a request for an accommodation. *See supra* III.B. Thus, Monroe has not shown that he engaged in a protected activity that could sustain an ADA-based claim of retaliation.

Second, and relatedly, Monroe cannot show causation between his decision to file a claim for workers' compensation and the rescission of his conditional offer of employment. In his brief, Monroe claims that "[t]he temporal proximity is very suspect." (Doc. No. 23-1 at 16.) But there is no dispute that he filed his workers' compensation claim in June 2021, and he did not learn that his job offer was rescinded until March 2022. (Doc. No. 16-31 at 2; Doc. No. 23-5 at 3.) *See Long v. Spalding Auto. Inc.*, 337 F. Supp. 3d 485, 491–92 (E.D. Pa. 2018) ("Here, nearly nine months passed between Plaintiff's request for an accommodation and [the adverse employment action]. Such a prolonged period of time is not unusually suggestive of a retaliatory motive." (internal quotations omitted)). Not only is there a significant gap of time between the alleged protected activity and the alleged adverse employment action, but there is no evidence that the workers' compensation case played a role in the decision to rescind his conditional offer. Because he has not shown that he engaged in a protected activity or raised an inference that the

15

protected activity was the reason for the rescission of his conditional offer of employment, the Court grants summary judgment for the Department on Monroe's retaliation claims under the ADA and PHRA.

## IV.     Conclusion

For the reasons set forth above, the Court grants the Department's motion for summary judgment. An accompanying order follows.